**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KEVIN HUSTED, SR., individually and on behalf of all others similarly situated,

Plaintiff,

v.

BARNES & NOBLE BOOKSELLERS, INC.,

Defendant.

Case No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Kevin Husted, Sr. ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action suit against Defendant Barnes & Noble Booksellers, Inc. ("B&N" or "Defendant") for aiding, agreeing with, employing, or otherwise enabling the wiretapping of the electronic communications of visitors to its website, barnesandnoble.com (the "Website").

2. When consumers enter text into the search bar on the Website, they expect their search results will simply be sent to B&N to help consumers find a particular book or other product. Instead, any text entered into the search bar is secretly recorded, read, and intercepted by a third party, Google, through the "Site Search Tracking" function of its "Google Analytics" API.

3. More invasively, Google—as enabled by Defendant—collects the contents of users' communications with Defendant (*i.e.*, the text entered into the search bar) ***before*** a user hits "enter" or clicks the "search" button. In other words, Google—as enabled by Defendant—is

collecting text entered into the search bar on the Website, regardless of whether the user actually performs the search.

4. Google then uses the data it collects for its own purposes, such as developing new products and for advertising.

5. Google's activities on the Website violate the California Invasion of Privacy Act ("CIPA") § 631(a), which prohibits, *inter alia*, a third party "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads[ing], or attempt[ing] to read, or [] learn[ing] the contents or meaning of any message, report, or communication while the same is in transit … or is being sent from, or received at any place within this state." CIPA § 631(a) also prohibits a third party such as Google from "us[ing], in any manner, or for any purpose, or [] communicat[ing] in any way, any information so obtained." CIPA § 631(a). And, because the nature of Google's licensing agreement with Defendant is such that Defendant "aids, agrees with, employs, or conspires" to permit Google's wiretapping, Defendant has also violated CIPA § 631(a). This third, "aiding and abetting" prong, is the basis for Defendant's liability here.

6. Plaintiff brings this action for damages and other legal and equitable remedies resulting from Defendant's violations of CIPA § 631(a).

## **FACTUAL BACKGROUND**

### I. HISTORY AND OVERVIEW OF CIPA § 631

7. The California Legislature enacted CIPA in 1967 "to protect the right of privacy of the people of this state." CIPA § 630. Specifically, the California Legislature found as follows:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

*Id*.

8. As relevant here, CIPA § 631(a) imposes liability for four "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that a defendant, "by means of any machine, instrument, contrivance, or in any other manner," did any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained;
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

9. Courts have elaborated on the legislative purpose behind CIPA § 631(a) specifically. For instance, in *Ribas v. Clark*, 38 Cal. 3d 355, 363 (1985), the California Supreme Court held "the Legislature's express objective in enacting section 631" was to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." (Cleaned up).

10. The California Supreme Court further noted:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements … Indeed, it is probable that the Legislature viewed section 631 as a means of proscribing attempts to circumvent other aspects of the Privacy Act, e.g., by requesting a secretary to secretly transcribe a conversation over an extension, rather than tape recording it in violation of section 632.

*Id.* at 360-61; *see also Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021) (reaffirming principles set forth in *Ribas*). The Ninth Circuit has likewise held that one of the purposes of wiretapping statutes is "to prevent the acquisition of the contents of a message by an unauthorized third-party or 'an unseen auditor.'" *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020).

11. Further, although "written in terms of wiretapping, Section 631(a) applies to Internet communications." *Javier v. Assurance IQ, LLC*, 2022 WL 1744107 (9th Cir. May 31, 2022). Indeed, courts have consistently applied CIPA § 631 to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *see generally In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d at 596 (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

12. In addition, CIPA § 631(a) prohibits wiretapping without "the consent of *all parties*

to the communication." (Emphasis added). In other words, unlike the federal Wiretap Act or New York's wiretapping law, CIPA is a two-party consent statute. Such consent must be obtained prior to any communication taking place, and not after-the-fact. *Javier*, 2022 WL 1744107, at *1-2.

## II. GOOGLE—AS AIDED, AGREED WITH, EMPLOYED, OR ENABLED BY DEFENDANT—WIRETAPS WEBSITE USERS' COMMUNICATIONS

### A. Google Collects The Content Of Users' Search Inquiries On The Website, Even Before They Hit The "Submit" Or "Enter" Button

13. Defendant owns and operates the Website. On any given page of the Website, users can enter text on the search bar at the top of the web page:




14. Users can use the search function on Defendant's Website to search for books "by Title, Author, Keyword or ISBN."

15. Nothing about the search bar indicates that the contents of any search is going anywhere other than to Defendant. There are no indicators saying, for instance, "Search Provided by Google," or a privacy policy the user must click on prior to using the search function that might

disclose such conduct. Thus, Website users, including Plaintiff, reasonably believe that any text they enter into the search bar goes to B&N and only to B&N.

16. Further, in order to perform a search, a user must either hit the "enter" key on their keyboard or click the "search" button (*i.e.*, the magnifying glass icon). Thus, Website users, including Plaintiff, reasonably believe that text they enter into the search bar is not transmitted to B&N, let alone any other third-party entity, before hitting the "enter" key or clicking the "search" button.

17. However, the text entered into the search bar goes to Google in real time as the text is being entered, and ***before*** a user actually performs the search function.

18. Defendant incorporates multiple "application programming interfaces" ("APIs") into its Website. APIs "enable[] companies to open up their applications' data and functionality to external third-party developers, business partners, and internal departments within their companies."[1]

19. Defendant integrates the Google Analytics API—and, specifically, the "Site Search Tracker" function of the Google Analytics API—into its Website.

20. The Google Analytics API is owned by Google.

21. Text entered into the search bar on the Website is transmitted to Google through the "Site Search Tracker" of the Google Analytics API in a completely unredacted manner, and is transmitted to Google regardless of whether or not a user actually performs the "search" function.

22. Google Analytics is a web analytics service offered by Google that tracks and reports website traffic. Google Analytics is not simply a "tool" provided by Google to website

---

[1] IBM CLOUD EDUCATION, APPLICATION PROGRAMMING INTERFACE (API), https://www.ibm.com/cloud/learn/api.

developers. Rather, Google provides Google Analytics as a "software-as-a-service," meaning it is Google itself who receives, stores, and analyzes any data sent to it at Defendant's behest.

23. Google uses the data it receives from the Google Analytics API to improve its existing products, develop new products, and for advertising purposes.

24. Among the features of Google Analytics is "Site Search Tracking" ("STT"). Google states, "Site Search lets you understand the extent to which users took advantage of your site's search function, which search terms they entered, and how effectively the search results created deeper engagement with your site."[2] Site Search also allows Google to understand and utilize all of this information for its own purposes too.

25. STT enables the analysis of this data by transmitting the following information to Google:

- "The web pages from which visitors started their search on your website (**start pages**)";
- "The **search terms** used by website visitors to find information on your website";
- "The **search categories** used by website visitors";
- "The web pages visitors saw after clicking on one of the search results on the search result page (*i.e.*, **search destination pages**)"; and
- "How effective the search results were in driving user engagement, sales and conversions."[3]

---

[2] SET UP SITE SEARCH, https://support.google.com/analytics/answer/1012264?hl=en#zippy=%2Cin-this-article.

[3] Google Analytics Site Search Tracking Tutorial, https://www.optimizesmart.com/understanding-site-search-tracking-google-analytics/#0-introduction-to-site-search-or-internal-site-search- (emphasis in original).

26. Through Google's acquisition of user's search terms—or searches that were entered but not actually performed—Google also measures, among other things, the number of users who searched for a particular term:




27. Accordingly, as currently deployed—including on Defendant's Website—Google's Site Search Tracker functions as a wiretap.

28. Using the data captured by Google, website developers can also "include[e] site search terms as keywords in your paid campaigns [to] help you target your ads to the most receptive audience."[4] However, using this feature means linking Site Search to Google Ads,[5] meaning Google not only wiretaps users communications with websites through the search bar, it also uses that data to itself run advertisements for the website developers.

---

[4] LEVERAGING INTERNAL SITE SEARCH, https://support.google.com/analytics/answer/2531545?hl=en.

[5] PRODUCT LINKING: LINK A GOOGLE ANALYTICS (UNIVERSAL ANALYTICS) PROPERTY TO GOOGLE ADS, https://support.google.com/google-ads/answer/1704341?co=ADWORDS.IsAWNCustomer=false&hl=en.

29. Of course, Google does not gain access to websites by itself. Instead, Google enters into licensing agreements with website developers such as Defendant, who provide Google with the relevant website code and data in exchange for the provision of Google's services.

30. Thus, by entering into this agreement for the provision of Site Search Tracking on the Website, Defendant aided, agreed with, employed, or otherwise enabled Google's wiretapping.

31. Defendant knows that Google captures the electronic communications of visitors to the Website and pays Google to conduct these activities.

32. Google's Site Search Tracking feature works as described in the aforementioned allegations on the Website.

33. Users do not provide their prior consent to Google's wiretapping, nor Defendant's aiding, agreement with, employment, or enabling of the same. *Javier*, 2022 WL 1744107, at *2 ("[W]e conclude that the California Supreme Court would interpret Section 631(a) to require the prior consent of all parties to a communication."). Indeed, although the Website displays a banner with its "Cookie Policy" inconspicuously hyperlinked, users are not required to assent to any sort of policy in order to access or use any feature on the Website.

## III. EXPERIENCE OF PLAINTIFF

34. In or about December 2022, Plaintiff visited the Website while in California.

35. While on the Website, Plaintiff entered text into the search bar onto the Website in order to search for various books.

36. The content of Plaintiff's electronic communications with the Website—specifically, the text he entered into the search bar—was intercepted, read, and learned by Google, who then used the contents of Plaintiff's electronic communications to target him with advertisements based on his search terms.

37. Google's wiretapping was aided, agreed with, employed, or otherwise enabled by Defendant.

38. At all times relevant, Plaintiff never consented, agreed, nor otherwise permitted Google to wiretap his electronic communications, nor did Plaintiff consent, agree, nor otherwise permit Defendant to aid, agree with, employ, or otherwise enable Google's wiretapping.

39. Plaintiff reasonably believed that when he entered text into the search bar on the Website, he was only communicating with Defendant, and not with third parties like Google. Plaintiff was thus not on notice of any wiretapping when he used the search function on the Website, nor did he provide his prior consent to the same.

40. Plaintiff was in California when he accessed Defendant's website through an internet browser. Upon having his browser access the website in California, Google's Site Search Tracker instructed the browser in California to send electronic communications directly to it from the California location of the browser to Google's servers, which are also located in California.

41. Google has access to Plaintiff's chat interactions with Defendant because Google contracts with Defendant to provide the Site Search Tracker.

**PARTIES**

42. Plaintiff Kevin Husted, Sr. is, and has been at all relevant times, a resident of California and has an intent to remain there, and is therefore a citizen of California.

43. Defendant Barnes & Noble Booksellers, Inc. is a Delaware corporation whose principal place of business is located at 33 E 17th Street, New York, New York 10003.

**JURISDICTION AND VENUE**

44. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A)

because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and at least one member of the proposed class is citizen of a state different from at least one Defendant.

45. This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in California.

46. Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because Defendant resides in this judicial district.

## CLASS ALLEGATIONS

47. **Class Definition:** Plaintiff seeks to represent a class of similarly situated individuals defined as all California residents who used the search function on the Website while in California (the "Class").

48. Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

49. **Numerosity (Fed. R. Civ. P. 23(a)(1)):** At this time, Plaintiff does not know the exact number of members of the aforementioned Class. However, given the popularity of Defendant's Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

50. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members. Common legal and factual questions include, but are not limited to, whether Defendant has violated the CIPA and whether Class Members are entitled to actual and/or statutory damages for the aforementioned violations.

51. **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, used the search function on Defendant's Website and had his electronic communications wiretapped by Google, as enabled by Defendant.

52. **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the CIPA. Plaintiff and his counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class. Neither Plaintiff nor his counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class. Plaintiff has raised viable statutory claims, or the type reasonably expected to be raised by members of the Class, and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant took.

53. **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Even if every member of the Class could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management

difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF CIPA § 631(A)

54. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

55. Plaintiff brings this claim against Defendant individually and on behalf of the Class.

56. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*

> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

57. Google's Site Search Tracker is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

58. Google is a "separate legal entity that offers 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Accordingly, Google was a third party to any communication between Plaintiff and Class Members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 2023 WL 114225, at *6 (N.D. Cal. Jan. 5, 2023).

59. At all relevant times, by using the Site Search Tracker, Google willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and putative Class, on the one hand, and Defendant's Website, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

60. At all relevant times, by using the Site Search Tracker, Google used the wiretapped electronic communications in order to target Plaintiff and Class Members with advertisements on Defendant's Website.

61. At all relevant times, Defendant aided, agreed with, employed, conspired with, or otherwise enabled Google to wiretap consumers to the Website using the Site Search Tracker and to accomplish the wrongful conduct at issue here.

62. Plaintiff and Class Members did not consent to Google's intentional access, interception, reading, learning, recording, and collection of Plaintiff's and Class Members'

electronic communications. Nor did Plaintiff and Class Members consent to Defendant aiding, agreeing with, employing, or otherwise enabling Google's conduct.

63. The violation of CIPA § 631(a) constitutes an invasion of privacy sufficient to confer Article III standing.

64. Plaintiff and Class Members seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b) For an order declaring that Defendant's conduct violates the CIPA;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) An award of statutory damages to the extent available;

(e) For punitive damages, as warranted, in an amount to be determined at trial;

(f) For prejudgment interest on all amounts awarded;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so triable.

Dated: May 1, 2023

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Alec M. Leslie*
Alec M. Leslie

Alec M. Leslie
Max S. Roberts
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: aleslie@bursor.com
mroberts@bursor.com

**BURSOR & FISHER, P.A.**
Joel D. Smith (*Pro Hac Vice Forthcoming*)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: jsmith@bursor.com

*Attorneys for Plaintiff*